UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BEN UPTON,

          Plaintiff,

v.                                                    Case Number: 08-13995
                                                    Honorable Julian Abele Cook, Jr.

CITY OF ROYAL OAK, JIM ELLISON, MAYOR
OF THE CITY OF ROYAL OAK, TOM HOOVER,
CITY MANAGER FOR THE CITY OF ROYAL OAK,
MARY JO DIPAOLO, DIRECTOR OF HUMAN
RESOURCES, and C. BRIAN JAMES, FORMER
ASST. CITY ATTORNEY FOR THE CITY OF ROYAL
OAK, Jointly and Severally,

          Defendants.

_____/

ORDER

This is a case in which the Plaintiff, Ben Upton, has accused the Defendants, the City of Royal Oak (Michigan) ("the City"), et al.,[1] of (1) wrongfully retiring him from his employment as a municipal firefighter in violation of his fundamental rights under the First and Fourteenth Amendments to the United States Constitution, and (2) engaging in a civil conspiracy which was designed to force him into retirement. Currently pending before the Court is the Defendants' collective motion for entry of a summary judgment as to Upton's claims.

I.

The Plaintiff, Ben Upton, joined the City's fire department ("Department") as a firefighter

---

[1] The other named Defendants in this lawsuit are Jim Ellison (Mayor of Royal Oak), Tom Hoover (City Manager of Royal Oak), Mary Jo DiPaolo (Director of Human Resources for Royal Oak), and C. Brian James (Former Assistant City Attorney for Royal Oak).

1

in February of 1992. Upton claims that within four years of his hiring, he became the president of the firefighters' union. He also alleges that his union sought to have the residents of the City to vote on a ballot initiative in November of 2004 which, if approved by them, would have required the employment of additional municipal firefighters. According to Upton, the issue was hotly debated by members of the City Commission, and generated a considerable amount of discussion about this issue and other municipal concerns, such as the possible need to eliminate some City jobs if the ballot initiative passed. Although the record is silent as to whether the proposal actually passed, it is Upton's belief that he was fired in retaliation for his advocacy role in connection with the ballot proposal.

A.

Upton contends that he woke up one morning in February of 2004 with a severe neck pain. After a magnetic resonance imagining test ("MRI") was taken, he was urged by his examining physician to attend physical therapy sessions for relief. Several months later (June 8, 2004), Upton slipped and fell from a fire truck which resulted in injuries to his elbow, shoulder, and neck.

According to Upton, he was examined by at least four doctors and a physical therapist between December of 2004 and August of 2005. During the later part of December in 2004, Upton was referred to Dr. Charles Xeller, who ultimately concluded that he could return to work without any restriction. Upton claims that upon reporting for work (on a date that has not been identified in the pleadings), he was sent him home because of his continuing need for narcotic pain medication. He eventually returned to work on May 4, 2005 with the approval of his own physician, Dr. Robert Ho. However, Upton's work status was dramatically changed on May 31, 2005 when, during a regular check up, Dr. Ho advised him to permanently refrain from lifting more than thirty-five (35)

pounds. On the following day, Upton was sent home by his employer who, after being told of Dr. Ho's "permanent restriction" admonition, allegedly told Upton that he could not work with such a weight restriction in place. But, during the following month (June 25, 2005), Upton's personal neurosurgeon, Dr. Kanwaldeep Sidhu, issued a note to him which indicated that he could return to work without any restrictions. In late July of 2005, the Defendants directed Upton to participate in a functional capacity test to assess his physical fitness for returning for work. The physical therapist determined that Upton would be a good candidate for participating in a "work hardening program" which was designed to increase his overall strength. On August 4, 2005, the Defendants sent Upton for another medical examination by an orthopedic surgeon, Dr. Philip Mayer, who ultimately concluded that he could return to work without any restrictions.

The Defendants contend that Upton insisted on being given a light duty assignment while he underwent the "work hardening program" that had been recommended by the physical therapist. However, complications arose when, according to the Defendants, the City's insurance carrier refused to pay for Upton's participation in the "work hardening program" because there were no guarantees that he would be able to fully return to work.

B.

According to the Defendants, Upton never returned to full duty, but worked intermittently on injury leave, light duty, and/or sick leave. Although Department policy limited light duty to a sixty day period, the Defendants concede that Upton remained on light duty status from July 28, 2004 through December of 2004. Thereafter - beginning on February 2, 2005 - the Defendants allege that Upton began using sick days to cover his work absences. After exhausting his sick pay hours, Upton used the time that had been donated to him by other Department employees. When that bank of sick

3

time ran out, Upton remained on leave without pay and without income.

In June of 2005, Upton accepted the Defendants' offer for him to work as a dispatcher at the Royal Oak Police Department. However, Upton maintains that the City changed course and told him that the position was no longer available. Although the Defendant, Mary Jo DiPaolo, as the Director of the City's Human Resources, acknowledges that the dispatcher job offer was withdrawn, she maintains that this administrative decision was made out of a genuine concern that (1) the process of offering the position exclusively to Upton - and disregarding other potential candidates - violated civil service rules, and (2) the dispatcher job was not within the same bargaining unit as the firefighter position.

As an alternative proposal, the Defendants offered Upton a part-time, non-union position as a Code Enforcement Officer. But Upton rejected this offer because, in his opinion, the dispatcher position was an "at-will" job. According to Upton, the City was going through layoffs at the time, and his acceptance of the City's offer would have subjected him to being terminated without recourse.

C.

The Defendants posit that because Upton (1) could not perform the duties of a firefighter based on Dr. Ho's weight restrictions, and (2) had exhausted all of his available light duty, the City asked its Retirement Board to place him on disability retirement pursuant to Section 47A of the Firefighters' Collective Bargaining Agreement. According to Upton, he was first notified of the City's application to place him on disability retirement around September 14, 2005. A meeting of the Retirement Board was held one week later on September 21, 2005.

Upton says that the Defendants only presented the Retirement Board with selective medical

records, and improperly excluded the June 30, 2005 letter from Dr. Sidhu.[2] He also claims that the Defendants never gave him a copy of the packet that had been made available to the Retirement Board. Furthermore, Upton submits that he asked the members of the Retirement Board to permit him to undergo the work hardening program so that he could return to work. For reasons that were voiced during the meeting, his proposed solution was not adopted.

At the conclusion of the meeting, the Retirement Board concluded that Upton was disabled and placed him on a non-duty disability status because, in its judgement, his disability (1) predated the fall on June 8, 2004 and (2) was not related to his work as a firefighter. According to Upton, this distinction is significant, inasmuch as a duty disability pension would have paid him 66% of his annual salary, plus a lifetime of medical benefits. By contrast, he asserts that a non-duty disability pension pays a pension-recipient less than $12,000 per year and limits medical insurance coverage to a period of five years.

D.

While the retirement issue was pending, Upton also filed a worker's compensation claim against the City which he contends was managed by DiPaolo and Donna Hart, a claims adjuster from the Citizens Insurance Company. He points to Hart's testimony and written notes which (1) allegedly expressed her hopes that the Retirement Board would give Upton a "regular retirement," because any other decision would "certainly hurt [their] WC case . . . ," (2) reflect her observation that "the [C]ity wants to push [Upton] into a disability retirement," and (3) identify a desire by the City to challenge

---

[2]Although it is not a formal element of his complaint, Upton also notes that the entire September 21, 2005 Retirement Board Meeting - which was open to the public and included the participation of people such as his former wife - violated his right to the privacy of his health information, as protected by the federal Health Insurance Portability and Accountability Act (HIPAA).

5

Upton's claims because of a pre-existing medical condition.

On May 9, 2009, an administrative law judge, who had reviewed Upton's workman's compensation claim, ordered the City to pay benefits to him. In rendering his findings and conclusions, he found that (1) the the Retirement Board had a strong financial incentive for finding Upton's disability to be unrelated to his work, and (2) the decision to selectively utilize Dr. Ho's medical opinions to the City's advantage was "arbitrary and capricious"

## II.

Under Federal Rule of Civil Procedure 56(c), a motion for a summary judgment should be granted if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In bringing such a motion, the movant bears the burden of demonstrating the absence of a genuine issue of a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Sixth Circuit Court of Appeals has urged all district courts to examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the nonmoving party when such a dispositive motion is under consideration. Fed. R. Civ. P. 56(c); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir. 1991). It is the responsibility of the Court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### A.

To establish a claim against the Defendants, Ellison, Hoover, DiPaolo, and James under 42 U.S.C. § 1983, Upton must prove that they deprived him of a constitutional or federal statutory right while acting under the color of law.[3] *See Flagg Bros. v. Brooks,* 436 U.S. 149, 155-57 (1978); *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir.1995). Here, the Defendants concede that they acted under the color of state law during all of times that are relevant to this litigation. Nevertheless, it is their collective belief that Upton cannot produce any facts which would establish a violation of his First or Fourteenth Amendment rights.

(i) § 1983 Claim Arising out of Alleged Violations of Upton's First Amendment Rights

In order to sustain a 42 U.S.C. § 1983 retaliation claim on the basis of the First Amendment, a plaintiff must show that (1) he was engaged in a protected speech[4] (2) an adverse action was taken against him which would deter a person of ordinary firmness from continuing to engage in the alleged misconduct, and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Here, the Defendants acknowledge that for the purposes of this motion, Upton's speech

---

[3]Title 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding . . . .

[4]A public employee's speech is constitutionally protected when it addresses a matter of public concern, and his/her interest in making such statements outweighs the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968).

7

relating to the ballot initiative was constitutionally protected because it addressed a matter of public concern. However, the Defendants submit that Upton cannot show that the decision to retire him was motivated by an exercise to eliminate or minimize his right to free speech. While the Defendants acknowledge that causation is ordinarily a question of fact, it is their belief that the undisputed evidence shows that the challenged retirement was implemented because of the thirty-five pound weight restriction that had been imposed Upton by Dr. Ho.

To support their position, the Defendants note that the City had returned Upton to full-time employment as a firefighter in May of 2005 - an authorization that continued until May 31, 2005 when his work restriction was extended by Dr. Ho. Moreover, they argue that - although it was not obligated to do so - the City made several attempts to place Upton in alternate employment. The Defendants also note that Upton's retaliation claims are undermined by the passage of more than one year between the alleged protected activities (which occurred in May and June of 2004), and the adverse employment action in September of 2005.

In his effort to rebut the Defendants' argument, Upton argues that when viewed in a light most favorable to him as the non-moving party, the following facts establish genuine issues of a material fact regarding the question of causation:

(1) Prior to his retirement, three different doctors believed that he could return to work without restrictions, and, further, a physical therapist believed that he would be a good candidate for a "work hardening program" to strengthen his tolerance for work related activities;

(2) Despite these medical findings, the Defendants failed to provide him with an acceptable work alternative;

(3) The insurance adjuster, who handled his worker's compensation claim, made several statements that the Defendants were intent on pushing him into a non-duty disability retirement;

8

(4) In their appearance before the Retirement Board, the Defendants strongly argued that the work hardening program was not a reasonable option;

(5) The Defendants resolved a separate First Amendment retaliation claim that he had filed against one of the Defendants, C. Brian James,

(6) The Defendants were content to violate Upton's privacy by discussing his medical history at a public meeting;

(7) Another Defendant, Mary Jo DiPaolo, withheld a packet of information from the Retirement Board on September 21, 2005;

(8) The Defendant, C. Brian James, advised the City's Civil Service Commission that Upton's retirement decision could not be appealed; and

(9) The time lapse between his protected activity and his forced retirement occurred between November 2004 and September of 2005.

Upton's arguments are unavailing. He devoted scarce time in his pleading to describing the nature of his allegedly protected speech; however, none of his reasons pointed to a causal connection between his speech and his forced retirement. Upton correctly notes that the Defendants have taken inconsistent positions with regard to their belief in his disability status. But, standing alone, that fact says nothing about whether they harbored a discriminatory animus against him based on his protected speech. Upton points to no documentary or testimonial evidence to show that his forced retirement was motivated in any way by his First Amendment activity. At the summary judgment stage, Upton cannot rest upon mere supposition to sustain his burden. Accordingly, the Court finds that Upton has failed to support the claim that his First Amendment rights had been violated.

(ii) § 1983 Claim Arising out of Alleged Violations of Upton's Fourteenth Amendment Due Process Rights

To prevail on his due process claim, Upton must show that, as a public employee with a constitutionally protected property interest in his employment, he was discharged from his job, and that prior to being discharged, he was not given (1) any oral or written notice of the charges against

9

him, (2) an explanation of the employer's evidence against him, or (3) an opportunity to present his side of the story on the contested issues. *Molina-Crespo v. U.S. Merit Systems Protection Bd.*, 547 F.3d 651, 661 (6th Cir. 2008) (citing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 546 (1985)).

Here, the Defendants cite Upton's testimony wherein he acknowledged his receipt of the letter from DiPaolo in which she informed him that his retirement would be discussed at the meeting of the Retirement Board on September 21, 2005. They also assert that he took advantage of the opportunity to explain his position to the Retirement Board. Based on these facts, they proclaim that Upton received all the due process to which he was entitled under *Loudermill*.

In response, Upton emphatically denies these assertions by the Defendants. Characterizing the Retirement Board meeting as "a trial by ambush," it is Upton's position that he was completely unaware of the evidence that the City would attempt to present, and argues that copies of the documents which were presented to the Retirement Board during the hearing were not received by him until two weeks later. He further notes that the City took a different position before the Workers' Compensation Bureau, where it claimed that Upton was not disabled and was, therefore, eligible to return to work.

After reviewing the record, the Court accepts as true the Defendants' assessment. Upton's arguments constitute, in the main, conclusory refutations and accusations of the Defendants' claims. Yet, as the Defendants note, it is clear that Upton (1) acknowledged having received the letter from DiPaolo about the then-upcoming meeting, and (2) had an opportunity to present his side of the story to the Retirement Board. While it may be true that the Defendants did not provide Upton with the formal packet of material until after the hearing, it is equally apparent that those documents consisted

almost exclusively of Upton's medical records, to which he would presumably have had knowledge (and access) well in advance of the September 21, 2005 meeting. Inasmuch as Upton has failed to show that he was denied any of his rights under *Loudermill*, the Court finds that he has not established a violation of 42 U.S.C. § 1983 based on a deprivation of his Due Process rights.

B.

Claims under Section 1983 are limited by the doctrine of qualified immunity, which is a protection that "extends to government officials performing discretionary functions." *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999). In 1982, the Supreme Court crafted the qualified immunity doctrine to protect public officials "from undue interference with their duties and from potentially disabling threats of liability. *Harrlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). Thus, government officials, while acting in their official capacities, are immune from personal civil liability as long as their actions "do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818; *see also Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Moreover, a government employee will be shielded from liability if he acted under an objectively reasonable belief that his actions were lawful. *Ahlers v. Schebil*, 188 F.3d 365, 372-73 (6th Cir. 1999). Although the Defendants bear the initial burden of asserting the defense of qualified immunity, Upton must ultimately demonstrate that this doctrine is not applicable under the circumstances of the case at hand. *Williams v. Payne, et al.*, 73 F. Supp. 2d 785, 795, (E.D. Mich. 1999), citing *Blake* at 1007. In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts that have been shown by a plaintiff create a violation of a constitutional right. *Id.* The purpose of this prong is to "ensure that defendants 'reasonably can

11

anticipate when their conduct may give rise to liability'. . . . " *Williams, supra,* citing *United States v. Lanier*, 520 U.S. 259, 270 (1997). Second, if a plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.; But see, Pearson v. Callahan,* 129 S.Ct. 808, 816 (2009) (*Saucier*'s two-step procedure for evaluating qualified immunity claims is no longer mandatory, and leaves it to the discretion of the Court to decide which of the two prongs to address first).

Here, there is no evidence that the Defendants' acts violated any clearly established law involving the First or the Fourteenth Amendment. As noted above, Upton has failed to produce any data from which a fact finder could reasonably conclude that the Defendants (1) retaliated against him based on his constitutionally protected speech, or (2) denied him due process of law. Thus, the inquiry of the Court could end here. *Saucier, supra* at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). Yet, even if the Court had found that such a violation had occurred, the Defendants correctly note that Upton has not established that it would have been clear to any reasonable public official that his or her actions in forcing him into a non-duty disability retirement violated the First or Fourteenth Amendment. In theory, all public officials should know that it is impermissible to deny employees of due process or to retaliate against them for asserting their First Amendment rights. However, as the Defendants point out, this inquiry must be more specific. *Saucier* at 201 (a court must evaluate the second prong "in light of the specific context of the case, not as a broad general proposition."). While the circumstances which surround the Defendants' conduct may seem a bit suspect and their explanations may also seem to be inconsistent, the facts here - as alleged and proven thus far - are not actionable on the particular theories raised by Upton

in the first two counts of his complaint. Thus, the individual Defendants are entitled to qualified immunity from liability on these counts.[5]

C.

Under Michigan law, the essential elements of a civil conspiracy are (1) the existence of a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means. *Mays v. Three Rivers Rubber Corp*, 135 Mich. App 42, 48 (1984). Upton's claim must fail based on the intra-corporate conspiracy doctrine, which provides that a corporation cannot conspire with its own agents or employees. *Doherty v. American Motors Corp.,* 728 F.2d 334, 339 (1984). Where all of the defendants are members of the same collective entity, the law does not recognize the existence of two separate "people" to form a conspiracy. *Hull v. Cuyahoga Valley Joint Vocational School Dist. Board of Education,* 926 F.2d 505, 510 (6th Cir. 1991) (applying intra-conspiracy doctrine to a school district superintendent, the executive director of the district, and a school administrator, all of whom were employees or agents of the Board). Upton does not address this argument in his responsive brief, and, thus, he - by virtue of his silence - has defaulted on this issue. All of the individually named Defendants work as employees or agents of the City of Royal Oak. As such, under *Doherty*, and similar precedent, they all belong to one collective entity and thus cannot form a conspiracy with one another. The Defendants are therefore

---

[5] Moreover, Upton's reliance on *Habel v. Township of Macomb*, No. 06-1491, 258 Fed. Appx. 854 (6th Cir. 2007) is completely misplaced because there, it was clear that (1) the plaintiffs had engaged in extensive First Amendment protected activity, and (2) there was a significant factual question as to whether the plaintiffs had drawn swift and severe discipline from the defendant fire department in very close proximity to engaging in protected speech. Neither the nature of the plaintiff's speech, nor of the defendants' response here comes close to the facts at issue in *Habel.*

entitled to a summary judgment on this count of Upton's complaint.

D.

Municipal liability cannot be imposed under 42 U.S.C. § 1983 unless injuries are inflicted against a person pursuant to a policy or custom. *Monell v. Department of Social Services of City of New York* 436 U.S. 658, 694 (1978) (a local governmental entity may be responsible under § 1983 only when harm arises out of the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy. . . ."). To satisfy *Monell*, a plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir.1987), *overruled on other grounds by Frantz v. Vill. of Bradford,* 245 F.3d 869, 874 (6th Cir.2001).

Upton correctly notes that liability may be imposed upon a municipality for a single decision by a policymaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Under this theory, Upton points to provisions in the Royal Oak City Charter which grant executive rule making authority to the law department and the City Manager. Then, looking to the scope of their power as municipal executives, Upton claims that the Defendants, James and Hoover, exposed the City to liability as the result their comments about the probability of losing its worker's compensation case. Unfortunately, Upton's argument on this issue is confusing and somewhat convoluted. Because this issue was not properly briefed and analyzed – and he has not presented any persuasive argument or authority to rebut the Defendants' argument – the motion for a summary judgment in favor of the

City on this ground will be granted.[6]

Finally, the Defendants properly note that because the individual officers are not liable (based on the foregoing analysis), the municipality cannot be liable. In this regard, even Upton concedes that "if the [C]ourt were to dismiss the claims against the named Defendants, then [he] does not have a cause of action against the [C]ity individually."). Although he submits that the City's motion for a summary judgment may be premature, he makes no factual or legal argument as to why the Court should defer its ruling on this aspect on the Defendants' motion. Thus, his request will be denied.

### III.

For the reasons that have been stated above, the Court grants the Defendants' motion for summary judgment in its entirety.

IT IS SO ORDERED

Dated: September 22, 2010                          s/Julian Abele Cook, Jr.
   Detroit, Michigan                               JULIAN ABELE COOK, JR.
                                                            United States District Court

---

[6] In light of this ruling, the Court declines to consider the City's final alternative argument that Upton's tort claims are barred by the doctrine of governmental immunity, particularly to the extent that his response depends entirely on his now-refuted allegation that Defendants Hoover, Ellison, DiPaolo and James committed intentional torts by acting outside the scope of their office "when they determined to terminate [his] employment in violation of his rights secured under the First Amendment . . . and denied him due process which is otherwise required under the Fourteenth Amendment . . . ."

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 22, 2010.

s/ Kay Doaks  
Case Manager
